IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARC S. CASON, SR. #180-571
        Plaintiff        :

        v.        :  CIVIL ACTION NO. JFM-06-1911

MDPSCS, et al.,        :
        Defendants

**MEMORANDUM**

On July 24, 2006, plaintiff, a Division of Correction ("DOC") prisoner housed at the Roxbury Correctional Institution in Hagerstown ("RCI"), filed this 42 U.S.C. § 1983 civil rights complaint seeking money damages and alleging that he has been denied appropriate medical treatment for injuries to his eye and head that allegedly resulted after he fell from his wheelchair on June 22, 2006. Specifically, he alleges that prison health care personnel did not stitch his wound, gave him only Motrin for pain, failed to change his bandages, and did not clean his wounds. Additionally, he claims that after sustaining a second fall on July 13, 2006, health care personnel failed to stitch a wound, timely place him under observation, and properly treat him. He alleges that at the time the second fall occurred, the tier officer was absent from his housing area, resulting in a three-hour delay between the time the accident occurred and when he was discovered semi-conscious on the floor of his cell. Plaintiff sues the private health care provider, Correctional Medical Services, Inc. ("CMS") and the Maryland Department of Public Safety and Correctional Services ("MDPSCS," hereinafter "the State"), but fails to name specific individuals responsible for his alleged injuries.

CMS and the State have filed motions to dismiss or, in the alternative, for summary judgment (Paper Nos. 11 and 16). While plaintiff has not opposed these motions, he has filed affidavits reiterating his version of the facts of the case. (Paper Nos. 13 and 18). For reasons set forth herein

the dispositive motions, treated as motions for summary judgment, shall be granted.

**Standard of Review**

Plaintiff appears to state two claims against his care-takers: first, that he did not receive adequate and prompt medical attention after both falls; and second, that on June 22, 2006, the tier officer, in failing to make frequent inspections of the tier, failed to protect plaintiff by discovering his injury in a more timely manner. These claims are based upon alleged violations of the Eighth Amendment.

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex*, 477 U.S. at 322-323. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

A prisoner presenting a denial of medical care claim in violation of the Eighth Amendment must prove two essential elements. First, he must satisfy the "objective" component by illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). If this first element is satisfied, the prisoner must then prove the

subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of prison officials or health care personnel. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. Healthcare staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844; *see also Johnson v. Quinones*, 145 F.3d at 167.

When alleging a constitutional failure-to-protect claim under the Eighth Amendment, a prisoner must present evidence that a prison official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, for a prison official to be truly "subjectively reckless," he or she must have knowledge both of the risk of harm and also that conduct is inappropriate in light of that risk. *See Rich v. Bruce,* 129 F.3d 336, 339-40 (4th Cir. 1997).

Preliminarily, the court notes that plaintiff has failed to name the proper party defendants. CMS and the Department of Public Safety have no vicarious liability for injuries allegedly caused by staff members under the facts alleged herein. *See Monell v. Department of Social Services*, 436 U.S. 658, 691-94 (1978); *Baker v. Lyles*, 904 F.2d 925, 929 (4th Cir. 1990). The court's obligation

to review plaintiff's Eighth Amendment allegations, however, does not end as a result of his insufficient pleading.

**Analysis**

As a result of a stab wound to the neck sustained in 1998, plaintiff suffers quadriparesis, a weakness in all four extremities. Plaintiff has limited use of his hands, no use of his legs, and is unable to move about without the use of a wheelchair. (Complaint at 5; Paper No. 11, Exhibit A, ¶ 3). In the instant action, he claims that on two occasions he fell while attempting to move from his wheelchair to his bed.

The June 22, 2006, Incident

At approximately 11:00 p.m. on June 22, 2006, plaintiff fell from his wheelchair and "busted the right side of [his] eye open when [he] slammed onto the floor." (Complaint at 4). He claims he "laid on the floor for several hours before a Division of Corrections officer could be made aware of [his] injury." He states that his injury would have been promptly discovered had the officer performed his duty by making rounds every half-hour. (Paper No. 18 at 1). He was taken to the RCI medical unit and treated by "Nurse Joann," who allegedly "just wiped my eye with saline and put a piece of some kind of tape" over the cut. *(Id.)*. Plaintiff claims that: the tape was never changed; he should have received stitches for the injury; and he received only Motrin, which was ineffective in treating his pain. (*Id.* at 4-5).

The uncontroverted medical records reveal a somewhat different scenario. Plaintiff reported to the medical unit at approximately 1:40 a.m., and told Nurse Perry that he had fallen around 12:30 a.m., while transferring from his wheelchair to his bunk. Plaintiff had a 2.5 cm. laceration over the right eyebrow. While there was no "depth" to the laceration, the area was slightly swollen. Nurse

Perry cleaned the area and applied steri-strips – thin pieces of special tape used instead of sutures – to close the laceration.[1] Plaintiff, who already was receiving Ultram three times a day,[2] was given Motrin for pain and told to apply ice every four hours for the next day. He was told to keep the area clean, dry, and undisturbed, and to report to the dispensary the following day. (Paper No. 11, Exhibit A, ¶ 4; Exhibit B, ¶ 3; and Exhibit C at 1-3, 19-20).

Plaintiff was examined on June 23, 2006. The steri-strips were intact and there was no drainage from the area. He was seen again on June 26, 2006. Although some dried blood was present, the steri-strips remained in place. By June 29, 2006, the laceration had healed. The nurse removed the steri-strips, cleaned the area with saline and Betadine (a skin antiseptic), and applied antibiotic cream to the area. (*Id.*, Exhibit A, ¶ 5 and Exhibit C at 2).[3]

On July 6, 2006, plaintiff was examined by Dr. Tritsch in response to a sick call slip submitted earlier that week listing complaints of blurred vision and throbbing pain in the right eye. Dr. Tritsch examined plaintiff for additional complaints concerning pain in the neck, jaw, shoulder and knees, and increased plaintiff's dosage of Klonopin.[4] Dr. Tritsch also renewed plaintiff's Ultram prescription to help with pain. (*Id.*, Exhibit B, ¶ 7).

<u>The July 13, 2006, Incident</u>

---

[1] These strips are used to lessen scarring and are easy to care for. They are to be left in place for about ten days. *Id.*, Exhibit B, Affidavit of Sarah Barr, physician's assistant, at 2, n. 3.

[2] Ultram, a narcotic-like pain reliever, is less addictive than narcotics. *Id.*, Exhibit B at 3, n. 4.

[3] On June 28, 2006, Dr. Harold Tritsch ordered physical therapy for plaintiff, and also added Baclofen, a muscle relaxant used to relieve cramping and muscle tightness, to his prescription drug regimen. *Id.*, Exhibit B, ¶ 6. It is unclear whether these actions were taken in response to plaintiff's comments that he frequently fell while transferring in and out of his wheelchair.

[4] Klonopin, also known as clonazepam, is an anticonvulsant medication that has been shown to decrease muscle weakness, numbness, and spasticity and stiffness in patients with quadraparesis. *Id.*, Exhibit B at 4, n. 6.

Plaintiff claims that around midnight on July 13, 2006, he again fell while transferring from his wheelchair to his bunk, "splitting [his] forehead open and knocking [himself] out" before regaining consciousness around 2:00 a.m. He was unable to summon help until approximately 3:00 a.m., when an officer opened his feed slot for breakfast and found plaintiff on the floor. (Paper No. 1 at 5). He claims that Nurse Perry entered his cell, checked his wound, and had him placed on a plastic board, then delayed his removal to the medical department for some forty minutes, while she dispensed insulin to other prisoners on the tier. He claims that he fell in and out of consciousness during this time. Once at the medical department, blood on his face and body were wiped. Plaintiff claims he was discharged from the medical department at 10:00 a.m. but provided nothing for pain. (*Id*. at 6). Plaintiff claims to still suffer from throbbing head pain and blurred vision and states that he never received an MRI or x-rays or provided with effective pain medication. (Paper No. 18 at 2-3). He also claims that his urine was tested several days later, because prison officials suspected his falls were caused because he was under the influence of illegal drugs. (Paper No. 1 at 6).

The medical records belie some aspects of plaintiff's claims. At approximately 3:00 a.m., Nurse Perry, who was on her way to plaintiff's tier to administer insulin to diabetic prisoners, was told plaintiff had been found on the floor bleeding from the head. Ten minutes later she found plaintiff on his side, a pool of blood a foot away from him. Plaintiff was awake and indicated he had fallen from his wheelchair. The nurse checked plaintiff's vital signs, dressed his head wound, and assessed that he was alert and oriented and that his pupils were equal and reacted to light. (Paper No. 11, Exhibit C at 8). Because plaintiff's condition was stable, the nurse spent roughly ten minutes administering insulin before she and two prisoners placed plaintiff on a "Gator" for transport to the dispensary. (*Id*., Exhibit A, ¶ 8 and Exhibit B, ¶ 4). The nurse cleaned dried blood

from plaintiff's face, head, arm and hand, and found only the one head wound. Plaintiff remained at the dispensary, where the nurse or a correctional officer stayed with him at all times. Nurse Perry spent about forty minutes performing insulin injections, but periodically assessed plaintiff, who dozed but readily awakened, was responsive, and had no changes in the size of his pupils or their ability to adjust to light. (*Id*., Exhibit A, ¶ 9 and Exhibit B, ¶¶ 5-7).

When examined by a physician's assistant at 7:30 a.m. that morning, plaintiff was able to recall everything that happened leading up to his fall. He was alert and oriented, his pupils were equal and reactive, and his cranial nerve functions were intact. Steri-strips were applied to the 0.5 cm. laceration, and the PA noted plaintiff had a hematoma and may have suffered a concussion. Additional pain relief was not given because plaintiff already was receiving Ultram for pain. (*Id*., Exhibit A, ¶ 10).

On August 1, August 7, and August 8, 2006, plaintiff submitted sick call slips complaining of severe headaches, dizziness and blurred vision. When seen on August 8, however, he did not complain of dizziness. Examination revealed a slight decrease in distance vision. Plaintiff was placed on the schedule to see an optometrist. (*Id*., Exhibit A, ¶ 11). His Klonopin dosage was increased three days later to 3 mg. twice a day. (*Id*., Exhibit A, ¶ 12).

On August 16, 2006, plaintiff was evaluated by a nurse for complaints of headaches of increasing duration and frequency, dizziness, vertigo and sensitivity to light. He was given Motrin for pain. (*Id*., Exhibit A, ¶ 13).

On September 20, 2006, plaintiff submitted a sick call slip alleging excruciating headaches, blurred vision and dizziness due to "severe head injury." Examination was normal except for the slight vision impairment, which medical personnel believed to be the source of the headaches,

blurred vision and dizziness.  Plaintiff, who was on the list to see the optometrist, was given Motrin for pain.  (*Id.*, Exhibit A, ¶ 15).  Plaintiff registered the same complaints on September 22 and September 26, 2006.  (*Id.*, Exhibit A, ¶¶ 16-17).  It is not known as of this date whether plaintiff has seen the optometrist.

**Conclusion**

Assuming plaintiff has satisfied the first element by demonstrating serious medical injuries resulting from the June 22 and July 13, 2006, falls, he has failed to prove the second element by showing that the treatment received for his injuries was so inadequate as to meet the deliberate indifference standard announced in *Estelle*.  Plaintiff's acute injuries were promptly treated, his medications were adjusted, he was offered physical therapy, and he was examined repeatedly by a physician.  Evaluation for the vision problem that likely is causing his headaches, dizziness and blurred vision is scheduled and already may have occurred.  Health care providers have concluded that his injuries do not require all of the diagnostic tests and pain medication he seeks.  Mere questions of medical judgment are not subject to judicial review, *see Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975), and the "mere failure to treat all medical problems to a prisoner's satisfaction" is insufficient to support a civil rights claim under § 1983.  *Peterson v. Davis*, 551 F.Supp. 137, 146 (D. Md. 1982).  *Accord, Goff v. Bechtold*, 632 F.Supp. 697, 698 (S.W. W. Va. 1986)(prisoner cannot be ultimate judge of what medical treatment is necessary or proper in his case).  His Eighth Amendment claims against the contractual health care provider fails.

Plaintiff's Eighth Amendment claims against DOC personnel fare no better.  Assuming the officers assigned to plaintiff's tier did not make their rounds as frequently as they should, their lack of diligence neither caused the injuries sustained by plaintiff nor enhanced the severity of those

injuries. Plaintiff has no expectation of privacy while incarcerated, *see Hudson v. Palmer*, 468 U.S. 517 (1984), and in any event plaintiff does not indicate that he was sanctioned in any way following the taking of a urine sample.

    For the aforementioned reasons, defendants motions for summary judgment shall be granted. Judgment is entered in favor of defendants and against plaintiff. A separate Order follows.

Date: February 28, 2007                      /s/
                                                J. Frederick Motz
                                                United States District Judge